BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: PROTON PUMP INHIBITOR | ) | MDL Docket No.: 2789 |
| PRODUCT LIABILITY LITIGATION | ) | |
| (NO. II) | ) | |

## INTERESTED PARTY RESPONSE OF 19 PLAINTIFFS
## TO THE MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. §1407
## FOR COORDINATED AND CONSOLIDATED PROCEEDINGS

## I.   PRELIMINARY STATEMENT

Your undersigned represents Plaintiffs[1] in 19 of the over 180 substantially-similar proton pump inhibitor ("PPI") actions pending in various United States District Courts across the country (hereinafter collectively referred to as the "Plaintiffs"), and the Plaintiffs submit this Response to the motion brought by Seeger Weiss LLP (the "SW Motion"), who, on May 31, 2017, moved for consolidated and coordinated pretrial proceedings under 28 U.S.C. § 1407.

For the reasons set forth herein, Plaintiffs support the consolidation request set forth in the SW motion and agree that centralization of all PPI actions pursuant to 28 U.S.C. § 1407 is warranted at this time.  Particularly, a single multidistrict litigation ("MDL") is the most efficient and most appropriate vehicle for these actions because it would: (1) promote the just and efficient conduct of these actions; (2) prevent inconsistent pretrial rulings and duplicative discovery; and

---

[1] Plaintiffs Betty and James All, Joey Burnett, Hope Butler, Terry Buzbee, Timothy and Linda Church, Bonnie Donecker, Charles Gaglio, Carlos and Moanette Gomez, Sampson Gregg, Mildred Harris, Sheree Kreuger on behalf of Mary Ann Fonner, Timothy Koon, Cheryl Lear, Shanda and Jason Lockard, John and Pamela Rosensteel, Rose Roundtree, Kathy Weiter, Barbara Bradford and Marsha Richards are represented by your undersigned.   Their personal actions are currently pending in 12 different federal district courts and seek damages for personal injuries they suffered as a result of brand name prescription and over-the-counter PPIs.  A schedule of these actions is attached hereto as Exhibit A.

(3) conserve the resources of the judiciary, the parties and their counsel.  This is especially true here because it is alleged that PPIs, as a *class*, cause the alleged kidney injuries.

As this Panel is aware, a motion for consolidation and coordination of all PPI actions into one MDL for pretrial proceedings was previously denied by this Panel on February 2, 2017 (the "Prior Decision").  *In Re Proton-Pump Inhibitor Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 15934 (J.P.M.L. Feb. 2, 2017).  Since that time, the factual circumstances that had supported the Panel's Prior Decision have significantly changed, such that consolidation and coordination is now warranted.  Specifically, the number of cases filed has increased dramatically from 39 to over 180 and this figure is expected to continue to rise.   Further, and most importantly, your undersigned has been informed that three of the four primary Defendants who had originally opposed consolidation – AstraZeneca, Procter & Gamble, and Pfizer[2] – are now taking the position that MDL consolidation, as opposed to informal coordination, will best serve the interests of the parties, their counsel and the judiciary.  Plaintiffs are only aware of one Defendant – Takeda[3] – that may still oppose centralization.[4]

As the Panel may recall, originally, all Defendants, including Takeda, opposed consolidation and coordination pursuant to 28 U.S.C. § 1407 submitting that informal coordination

---

[2] AstraZeneca refers to Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP.  Procter & Gamble refers to Procter & Gamble Manufacturing Company and The Procter & Gamble Company.  Pfizer refers to Wyeth Pharmaceuticals, Inc., Wyeth LLC and Pfizer, Inc.

[3] Takeda refers to Defendants Takeda California, Inc., Takeda Global Research & Development Center Inc., Takeda Pharmaceutical Company Limited, Takeda Pharmaceutical U.S.A. Inc, Takeda Pharmaceuticals LLC and Takeda Pharmaceuticals International Inc.

[4] In response to the W&L Motion, Defendants had originally argued that there were numerous defendants at issue and consolidation would lead to confusion given this vast number of defendants.  However, experience has shown that only four primary Defendants are really at issue in these actions – AstraZeneca, Takeda, Procter & Gamble and Pfizer.

would be more efficient and serve the best interest of the parties, their counsel and the judiciary.[5] However, since the Panel issued its Prior Decision, your undersigned submits that informal coordination has proven unsuccessful despite the diligent efforts made by all Plaintiffs' counsel.

The reasons behind this lack of success are discussed in greater detail, *infra*, but, in short, despite the fact that Defendants represented to the Panel that they would engage in informal coordination, just the opposite was done, and it appeared that Defendants instead employed a litigation strategy designed for the sole purpose of avoiding such coordination.[6] In light of their actions, as well as all of the filings that plaintiffs anticipated in such a short time period, informal coordination has proven not workable..  Moreover, and whatever their motives before, three of the four primary Defendants now fully support centralization of these cases to a MDL.

Accordingly, Plaintiffs respectfully request that the Panel grant the SW Motion in so far as it seeks to consolidate all PPI actions into one MDL because consolidation and coordination pursuant to 28 U.S.C. § 1407 is the ***only*** efficient and effective means of managing these actions.

As to the appropriate venue for this MDL, Plaintiffs submit that only two venues stand out: (1) the Southern District of Illinois, before the Honorable David R. Herndon; or (2) the District of New Jersey, Newark Division, before the Honorable Claire C. Cecchi.

As discussed in detail further below, the Southern District of Illinois is geographically central and, thus, an easy location for the parties and their counsel to travel.  While the District of

---

[5] *See Brief of AstraZeneca in Opposition to Motion for Transfer of Actions*, p. 9, MDL-2757 [Doc. 58]; *Takeda's Response in Opposition to Motion for Transfer of Actions*, pp. 4-5, MDL-2757 [Doc. 59]; *Brief of Defendant The Procter & Gamble Company in Opposition to Plaintiffs' Motion for Transfer*, pp. 15-16, MDL-2757 [Doc. 60]; and *Brief of Pfizer in Opposition to Motion for Transfer of Actions*, p. 3 (endorsing AZ brief), MDL-2757 [Doc. 61].

[6] By way of example, through motion practice and other similar means, Defendants have affirmatively sought inconsistent and disparate rulings, especially in situations where federal courts have issued rulings Defendants deemed to be disadvantageous to them.

New Jersey is not as geographically central, it is one of the most easily accessible venues for the parties and their counsel given its location in one of the main transportation hubs in the country. But most importantly, what both of these venues have in common are judges who appear to have taken an interest in these actions and who are managing the actions currently assigned to them in an efficient and effective manner.

## II.      FACTUAL CLAIMS ABOUT PROTON PUMP INHIBITORS

PPIs are a class of drugs, which are used for the treatment of various peptic disorders. PPIs work by inhibiting the hydrogen/potassium adenosine triphosphatase enzyme system.   By inhibiting these enzymes, PPIs reduce the level of acid production in the stomach.

The first PPI product, Prilosec, was approved by the United States Food and Drug Administration ("FDA") in 1989. Since then, several other PPI products have been approved for sale in the U.S. by the FDA.  PPIs are available: (i) by prescription only; (ii) as fixed-combination prescription drugs (e.g., a PPI paired with an antibiotic); and (iii) in non-prescription form (often referred to as over-the-counter ("OTC")). *Id.*  Defendants are responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing and/or selling a variety of PPIs, including Prilosec, Prevacid, Nexium, Dexilant, and/or Protonix in their prescription, combination product, and/or OTC forms.

Recently, PPIs have been linked to certain kidney injuries, including but not limited to acute interstitial nephritis ("AIN"), acute kidney injury ("AKI") and/or chronic kidney disease ("CKD").  On October 31, 2014, the FDA required PPI manufacturers to place consistent labeling regarding AIN risk on all prescription PPIs noting that "there is reasonable evidence of a causal association." *Id.*  To date, over-the-counter PPIs lack detailed risk information for AIN, and both prescription and over-the-counter PPIs lack detailed risk information for CKD.  Evidence from

recent findings incriminates all PPIs as they relate to kidney injury, thereby suggesting a class effect. *See, e.g.,* DG Moledina & MA Perazella, *PPIs and kidney disease: from AIN to CKD*, 29 J. Nephrology 611, 614 (2016); UC Brewster & MA Perazella, *Acute kidney injury following proton pump inhibitor therapy*, 71 Kidney Int'l 589, 592 (2007).

All Plaintiffs seek recovery against Defendants for personal injuries they suffered as a result of their ingestion of prescription and/or over-the-counter brand name PPIs.   There are no claims against manufacturers of generic PPIs.  Thus, any manufacturers of generic PPIs are not at issue here.   To this end, all Plaintiffs allege the same or similar injuries – kidney injuries, such as AIN, AKI and CKD, caused by PPIs as a class-wide drug.

At the time of the first application for centralization filed by Weitz & Luxenberg, P.C. (hereinafter the "W&L Motion") on October 17, 2016, 15 PPI actions were identified and by the time the Panel issued its Prior Decision, approximately 39 actions were pending.  This number has increased to over 180 actions today, and it is anticipated that this number will continue to increase. Given the volume of actions filed and the overlapping nature of the facts and issues involved, consolidation of all PPI actions into one MDL is undoubtedly warranted.

### III.    ARGUMENT

### A.    MULTIDISTRICT CONSOLIDATION IS APPROPRIATE FOR THESE CASES

Under 28 U.S.C. §1407, the Panel may consolidate numerous cases if the moving party sufficiently demonstrates that (1) the lawsuits contain common questions of fact, (2) consolidation would best serve the convenience of the parties and witnesses, and (3) consolidation promotes the just and efficient conduct of such actions.  *See* 28 U.S.C. § 1407.   Plaintiffs herein submit that these factors have been demonstrated, and, thus, centralization and coordination of pretrial proceedings against all PPI manufacturers is warranted.

First, each of the related actions against all PPI manufacturers allege the same and/or substantially similar facts: (1) PPIs, as a class, can cause AKI, AIN and CKD; (2) the plaintiffs suffered grave injuries, primarily to their kidneys, as a result of their ingestion of PPIs; and (3) the manufacturers here manufactured, marketed and/or sold the defective PPIs that caused these plaintiffs' injuries.[7]  Likewise, there is commonality as to the manufacturers' defense of these actions in that they all commonly deny that their PPIs can cause the injuries alleged.  Thus, the defects and increased risks and/or side effects associated with PPIs will be a central issue to all of these matters and this supports the need for consolidation.

Moreover, many PPI actions involve multiple defendants because PPI users quite often switched medications.  Thus, there are a number of cases that involve multiple products and multiple defendants and, as such, common issues of fact and law may overlap as to these actions.

In light of the numerous common questions involved in these cases that are intertwined as to all Defendants, consolidation of all PPI actions into one MDL is appropriate and will benefit all

---

[7] Plaintiffs submit that these related actions will collectively involve the following common questions: (1) whether PPIs in general pose an increased risk of developing AIN, CKD and/or other kidney injuries; (2) whether there is available scientific data to support a causal link between the use of PPIs and the development of AIN, CKD and/or other kidney injuries; (3) what is the generally accepted standard for post-marketing testing and/or surveillance of PPIs; (4) whether Defendants concealed, misrepresented and/or failed to warn of the increased risks and/or side effects associated with PPIs; (5) whether Defendants designed, manufactured, and/or marketed a defective product; (6) whether Defendants adequately and appropriately tested their respective PPIs; (7) whether Defendants failed to adequately investigate the safety concerns related to increased risks and/or side effects associated with PPIs; (8) what steps Defendants took to investigate and address safety concerns related to the increased risks and/or side effects inherent to PPIs; and (9) whether Defendants failed to adequately warn of the safety concerns regarding the suspect PPIs and/or supplement warnings as they discovered new safety concerns regarding PPIs because of under-reporting, underestimating, and/or downplaying the serious and dangerous safety concerns associated with PPIs.

the parties.  In addition to significant financial savings, transfer and consolidation will promote convenience for the parties and provide efficiency during pretrial proceedings.

By consolidating these actions into one MDL encompassing all PPI drugs, costly duplicative discovery will be reduced as will the potential for inconsistent judicial rulings, especially on such matters as foundational case management orders, discovery matters, including but not limited to issues surrounding privilege and confidentiality, certain third-party discovery, and of course, general *Daubert* rulings.[8]  *See e.g., In re Androgel Prods. Liab. Litig.*, 24 F.Supp.3d 1378, 1379 (J.P.M.L. 2014) (granting consolidation of all testosterone replacement therapy actions into one MDL despite differing manufacturers because they all shared factual questions regarding general causation, background science and regulatory issues; thus, centralization would reduce potentially costly expert discovery, facilitate the establishment of a uniform pretrial approach to these cases, reduce the potential for inconsistent rulings on such matters as *Daubert* rulings, and conserve the resources of the parties, their counsel, and the judiciary); *In re Incretin Mimetics Prods. Liab. Litig.,* 968 F. Supp. 2d 1345, 1346 (J.P.M.L. 2013) (same).[9]

---

[8] Because recent peer-reviewed medical and scientific literature support that kidney injuries are caused by PPIs as a *class*, discovery as to all Defendants will likely overlap, especially as it applies to the medical and scientific information that links PPI use to the alleged injuries.  To this end, expert witness opinions on causation and *Daubert* motions will likely overlap as to all defendants. It is simply more efficient to allow one Court to become familiar with the underlying science and to issue consistent rulings in this regard.  To this end, Plaintiffs submit that it is preferable for disputes regarding similar and/or identical discovery issues to be resolved by a single court (as opposed to various federal courts across the country), even when different products and defendants are involved. *See In Re Janus Mut. Funds Inv. Litig.,* 310 F.Supp.2d 1359, 1361 (J.P.M.L. 2004)(noting that centralization would streamline the resolution of overlapping issues concerning similar conduct).   As discussed *infra*, the lack of centralization has already resulted in inefficient and repetitive litigation of certain discovery issues.

[9] *See also In re Gadolinium Contrast Dyes Prods. Liab. Litig.,* 536 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008); (consolidating actions against five defendants because they involved common facts relating to causation despite the existence of differing product designs); *In Re Walgreens Herbal Supplements Mktg. and Sales Practices Litig.,* 2015 U.S. Dist. LEXIS 75045 (J.P.M.L.

Further, in *In re Incretin Mimetics Prods. Liab. Litig.,* 968 F. Supp. 2d at1346-47, all competitor defendants supported centralization, and *In re Androgel Prods. Liab. Litig.*, 24 F.Supp.3d at 1378, the primary defendant manufacturer supported centralization of all actions into one MDL.  The support by those defendants was an important factor the Panel considered when it granted consolidation in those cases.  *Id.*

Here, your undersigned has been informed that three of the primary four Defendants – AstraZeneca, Procter & Gamble & Pfizer – have changed their prior position and now all support centralization, which lends further support for a finding that consolidation and coordination is warranted here.  The fact that there is still one lone Defendant –Takeda -- who it appears continues to argue against such consolidation should be of no moment, and Takeda's position on consolidation should be deemed unpersuasive because that Defendant, who has advocated and continues to advocate for informal coordination, is, in reality, frustrating attempts at informal coordination by requiring both plaintiffs and various federal courts to re-litigate issues and orders that are unfavorable to it, and is thus actively promoting that inconsistent rulings be issued and extra work be required.[10]

---

2015)(noting that consolidation into a single MDL was appropriate to resolve the defendants' common challenges to the validity of the New York;  attorney generals' investigation and underlying testing data, and to address the common discovery regarding said investigation and data); *In re: Silicone Gel Breast Implant Litig.*, 793 F. Supp. 1098 (J.P.M.L. 1992)(holding that common questions exist as long as the different manufacturers;  all designed similar defective products); *In re Chinese Manufactured Drywall Prods. Liab. Litig.,* 626 F.Supp.2d 1346 (J.P.M.L. 2009)(holding that "[c]entralization under Section 1407 will eliminate duplicative discovery, including any discovery on international parties; prevent inconsistent pretrial rulings .... and conserve the resources of the parties, their counsel and the judiciary); ; *In Re Orthopedic Bone Screw Prods. Liab. Litig.,* MDL No. 1014. (finding common questions of law and fact even where different defendant manufacturers were named).

[10]    By way of example, Takeda agreed to a Protective Order in certain actions filed against it in the Eastern District of Pennsylvania.   Yet, in *Weiter v. Takeda Pharamceuticals Inc.,et al*, 1:16-cv-11199 (N.D.Ill), a separate action in Northern District of Illinois, Takeda is proposing a

As mentioned above, the Panel has repeatedly found centralization to be appropriate where there are multiple defendants and similar, though not identical, products are at issue – the key inquiry being whether there are common factual questions such as causation, science, testing and regulatory issues, which clearly there are here.  Furthermore, and important to the facts here, the Panel has also created an MDL over one defendant's objection.  *In re Gadolinium Contrast Dyes Prods. Liab. Litig.*, 536 F. Supp. 2d at 1381-82 (granting consolidation where all defendants, except for one, supported centralization).

As to the manageability and efficiency of an MDL with multiple manufacturers and products, the MDL Court has the power to "employ any number of pretrial techniques – such as establishing separate discovery and/or motion tracks for each [product at issue] and/or separate tracks for the different types of actions involved – to efficiently manage the litigation."[11]   *In Re Janus Mut. Funds Inv.* Indeed, there are well-established MDLs with multiple defendants that can be instructive where needed.

Lastly, the need for centralization is evidenced by the fact that there are already at least 180 PPI actions filed in at least 30 District Courts in 21 states.  This number has increased significantly since the Panel issued its Prior Decision (then 39 filed actions), and, it is estimated that there will likely be hundreds more cases (if not thousands) filed throughout the country in the

---

modified version of the already agreed to Eastern District of Pennsylvania Order, with terms more favorable to it; thereby seeking to re-litigate a seemingly already resolved legal issue.  Likewise, Takeda is requiring its parent company, which is a foreign Defendant, to be served in every case against it under the Hague Convention.  It is typical in complex litigation and/or mass torts that once service of a foreign defendant is made at least once, the parties agree with the Court's approval, that service on the foreign defendant can be modified such the costly and time consuming service requirements of the Hague  are no longer required in each and every case.

[11] Here, the MDL Court could create a system to ensure that any confidential information the manufacturers may be concerned about is protected.  An MDL court is more than capable of addressing any concerns that may arise through efficient case management.

very near future.  Because informal coordination of the currently filed actions is not working, as more cases are filed, these informal coordination difficulties will only grow.  Thus, Plaintiffs submit that centralization and coordination of all actions is clearly warranted.

**B.**    **CENTRALIZATION OF THESE CASES IS WARRANTED BECAUSE INFORMAL COORDINATION HAS FAILED**

All PPI actions should be centralized into one MDL because the "informal coordination" previously touted by Defendants has proven unsuccessful.  Indeed, the fact that three primary Defendants now fully support the creation of an MDL serves as the best evidence of this fact.

Since last appearing before this Panel, there has, unfortunately, been an inflated number of meet-and-confers between the parties as well as time consuming litigation and re-litigation of issues that have previously been decided by other judges assigned to these actions.  Simply put, informal coordination has not worked – and Plaintiffs have not been to blame.  Rather, it is the Defendants who, despite representing that they would engage in informal coordination with all Plaintiffs, have instead, at times, used the lack of centralized management and centralized oversight of these actions to attempt to obtain disparate rulings in other District Courts, particularly in those situations where they received unsatisfactory rulings.[12]

By way of example, your undersigned's firm alone has cases pending in 12 different District Courts.  In each of these cases, our firm, thus far, has had to do the following:

- Respond to virtually identical Rule 12 motions to dismiss in four nearly identical PPI complaints in in four different district courts.[13]

---

[12]  While the approach was well-intended for Defendants' interests, it has created significant duplicative work and effort on the parties and the many district courts overseeing these cases. Indeed, it is likely why the three primary Defendants now support MDL centralization.

[13] Regarding this issue, on February 15, 2017, Judge John W. Lungstrum, of the U.S. District Court for the District of Kansas, denied the motion to dismiss filed in *Jackie Koon v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-02605 (D. Ks. 2016)[Doc. 43].  This was the very first Order on a motion to dismiss issued in a PPI action in which your undersigned's law firm was counsel of record, and it is your undersigned's understanding that this was one of the very first Orders on

- Conduct approximately 10 Rule 26(f) conferences, often times re-arguing issues that Defendants lost, compromised, or waived at prior Rule 26(f) conferences.[14]

- Draft four "competing proposals" for reports pursuant to FRCP 26(f) on the same disputed issues;[15] and

- Conduct numerous meet and confers in an attempt on Plaintiffs' part to draft joint protective orders to be used in four jurisdictions.[16]

---

a motion to dismiss issued with respect to all of the PPI actions in general. Upon receiving this Order, your undersigned immediately contacted defense counsel in *Burnett v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-00894 (S.D. Oh.), where a very similar motion to dismiss an almost identical complaint to that of *Koon* was pending, to request that defense counsel withdraw their motion in light of the Order. Defense counsel refused, clearly seeking a disparate ruling on what amounted to identical issues. Defense counsel also refused to consent to the filing of a sur-reply in *Church v. AstraZeneca Pharmaceuticals LP, et al.*, 1:16-cv-07910 (S.D.W.V.) to advise that Court of the Koon decision.

[14] Some of these issues included Defendants' request that discovery be bifurcated such that matters relating to "general causation" be conducted before case-specific discovery. Plaintiffs argued that such an approach would result in a tremendous waste of time and resources and would require witnesses to be re-deposed. Plaintiffs have litigated this issue at least four different times. To date, this was tacitly rejected by all the Courts that have heard this issue. *See. e.g.*, *Koon v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-02605 (D.Kan.), *Butler v. AstraZeneca Pharmaceuticals, L.P*, et al; 2:17-cv-00183 (S.D. Oh.), and *Church v. AstraZeneca Pharmaceuticals LP, et al.*, 1:16-cv-07910 (S.D.WV.). Only then did Defendants ultimately agree to waive their bifurcation request in other venues.

[15] These dispute issues included: (1) the scheduling of fact discovery, specifically whether to conduct discovery on the issue of causation first (as proposed by Defendants) or on all issues simultaneously (as proposed by Plaintiffs); (2) the number of depositions and interrogatories allowed for each side; (3) the scheduling of expert discovery, (dependent on whether a court adopted Defendants' proposed discovery schedule); (4) preliminary issues related to Defendants' document productions such as whether a production certificate was required and the timelines for producing documents; and (5) whether meet and confers regarding the production of discovery materials and topics (as Defendants proposed) should be utilized in lieu of formal discovery requests. *Burnett v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-00894 (S.D. Oh.); *Church, et al. v. AstraZeneca Pharmaceuticals LP, et al.*, 1:16-cv-07910 (S.D.W.V.); *Koon v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-02605 (D. Kan.); and *Rosensteel, et al. v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00131 (S.D. Ill.).

[16] Yet, despite having entered and agreed to a Protective Order in the Southern District of Illinois, the parties are still meeting and conferring over Protective Orders in other jurisdictions and have had to brief issues relating to their competing proposals in other venues.

On this point, there are at least 10 other filed actions (in which your undersigned is counsel) in which Rule 26(f) conferences have not yet been held, and where, if a MDL is not created, there will likely be the same re-litigating of previously decided issues.[17]

Additionally, the above examples are related only to those cases represented by your undersigned's law firm.  This same process has been occurring in many other federal jurisdictions in which your undersigned has no cases, thus, underscoring why a MDL is needed – because it is the only way that these actions can be litigated in an efficient and effective manner.   Indeed, this is likely why three primary defendants now support the creation of an MDL.

All proceedings that have taken place in all of the PPI actions have required significant time and resources be expended by the parties, their counsel and the various federal courts in which these cases are pending. Plaintiffs have made efforts to streamline this process in the spirit of informal coordination but these efforts have been largely rejected by defense counsel.

While the motives behind Defendants' strategy of re-litigating rulings and issues and obtaining varying scheduling orders in different forums is not the topic of this briefing, the point is that disparate and inconsistent rulings are poised to occur as are non-uniform pretrial proceedings and the wasting of judicial time and efforts.  All of these results can be avoided if an MDL is created.   *See e.g. In re Androgel Prods. Liab. Litig.*, 24 F. Supp. 3d 1378 **5-6 ("Centralization of claims involving all testosterone replacement therapies will reduce potentially costly expert discovery, facilitate the establishment of a uniform pretrial approach to these cases, reduce the potential for inconsistent rulings on such matters as *Daubert* rulings, and conserve the resources of the parties, their counsel, and the judiciary.

---

[17] Your undersigned is currently investigating over 1,500 potential actions, and upon information and belief, many other national law firms are investigating similar, if not larger numbers.

Accordingly, MDL centralization of these cases will allow for consistent rulings and a uniform discovery schedule for all cases.  It will also prevent the inconsistent rulings that are beginning to manifest in just the infancy of this uncoordinated litigation.[18]  For these reasons, Plaintiffs respectfully submit that centralization would be highly beneficial here.

**C.   THE MOST APPROPRIATE VENUE FOR THIS LITIGATION IS THE SOUTHERN DISTRICT OF ILLINOIS OR THE DISTRICT OF NEW JERSEY**

Plaintiffs submit that the most appropriate venue for consolidated and coordinated pretrial proceedings is the Southern District of Illinois with an alternative appropriate venue being the District of New Jersey.   While the convenient location of these venues is an important factor to consider, the most important factor is that the judges assigned to the PPI actions in these venues have shown an interest in moving and advancing their consolidated actions over any other federal jurist with PPI actions pending before them.

**1.   The United States District Court for the Southern District of Illinois**

**a.   Seven PPI Actions are Pending in The Southern District of Illinois**

Currently, there are seven actions that are pending in the Southern District of Illinois, and they all have been consolidated before Judge David R. Herndon.[19]  This factor lends support to the

---

[18]  As discussed in further detail below, Judge Herndon of the Southern District of Illinois was the first judge overseeing PPI actions to issue a Protective Order and this Order was adopted by Judge Lungstrum of the District of Kansas.  Judge Claire Checchi later issued a Protective Order but it was not the same that was issued by Judges Herndon or Lungstrum.  A different Protective Order was also issued in the Eastern District of Pennsylvania actions in which Takeda was involved, but now Takeda is refusing to enter into the same Protective Order in other actions.

[19] *Irma Coleman v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00130; *Kenneth Dravland v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00133; *John Rosensteel v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00131; *Orlando McGill  v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00461; *Patricia Richardson v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00406; *Terry Winters v. AstraZeneca Pharmaceuticals LP, et al.*, 3:17-cv-00535; *Marsha Richards v. Wyeth Pharmaceuticals, Inc., et al.*, 3:17-cv-00609.

Southern District of Illinois as an appropriate venue for this MDL. *See In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 787 F. Supp. 2d 1355 (J.P.M.L. 2011); *see also In Re DePuy Orthopaedics, Inc.*, 753 F.Supp.2d 1378, 1380 (J.P.M.L. 2010).

Regarding these actions, three of them, *Dravland, Coleman* and *Rosensteel*, are farther along in the discovery process than the majority of all other filed PPI actions given Judge Herndon's drive to move the cases before him.  Judge Herndon has intimate familiarity with the current issues surrounding discovery and would be an excellent judge to preside over an MDL, if one were to be created here.

        **b.**      **Judge Herndon has the Experience to Manage These Actions Effectively and Efficiently and to Steer Them on a Prudent Course**

The Panel often times looks to experienced jurists to ensure that any given MDL will be managed in an efficient manner that is beneficial to all parties and witnesses involved.   Here, Plaintiffs submit that Judge Herndon is an exceptional jurist who has the mass tort experience needed to "steer[] this MDL on a prudent course."  *In re DePuy Orthopaedics, Inc.*, 753 F. Supp. 2d 1378 (J.P.M.L. 2010); *In re Mirena IUD Prods. Liab. Litig.*, 938 F.Supp.2d 1355 (J.P.M.L. 2013); *In re Vigara (Sildenafil Citrate) Prods. Liab. Litig.*, 2016 LEXIS 47256 (J.P.M.L. 2016).

Indeed, prior to the filing of the SW motion, Judge Herndon set the limited number of actions before him (then five) on a course designed for efficient and expeditious resolution. Specifically, on April 24, 2017, at an initial conference, Judge Herndon, who was aware of the other federal court actions, first inquired about the progress that had been made in these actions and what the partiers were doing with those cases.  (Attached hereto as Exhibit B is a copy of the transcript of said conference, p. 7.)  He assumed that these actions were "way ahead" of the actions before him and he was not wanting to "reinvent[] the wheel."  (*Id.*)  However, in response to his inquiry, AstraZeneca responded by saying that the other cases around the country "are not really

out in front at this point.  They are sort of just beginning because the cases were delayed by the

JPML briefing…Everybody is about on a similar track or close to being on a similar track. So

maybe we're inventing he wheel." (*Id.* at pp. 7-8.)

Given the response, Judge Herndon, as an experienced jurist, first wanted to know if any

judge had entered a company-wide litigation hold and he was told that none so far had.  (*Id.* at pp.

8-9.)  He then moved on to discovery because he knew the parties were not agreeing on deadlines,

especially as it applied to protective orders and ESI orders. (*Id.* at pp. 10-28.)    At the end of the

conference, he let the parties know that he moves litigations, and he would be entering deadlines

in order to get the actions before him moving. (*Id.* at pp. 28-29.)

The next day, likely in light of the conference and discussions held, the parties were able

to reach an agreement on discovery deadlines and a proposed discovery order (on agreement) was

submitted to the Court, which he incorporated into his Scheduling and Discovery Order issued on

the same date.  (Attached hereto as Exhibit C is a copy of said Order.)  Judge Herndon became the

first judge to issue a company-wide litigation hold as to the Defendants, and a presumptive trial

date was scheduled for August 2018. (*Id.*)  As a result of this Order, a Protective Order was entered

on May 5, 2017,[20] an ESI Order soon followed on May 9, 2017 and discovery was set to commence

on June 1, 2017 with AstraZeneca set to produce its first round of documents on June 2, 2017.

(*Id.*)

Document production and discovery has now commenced in the Southern District of

Illinois.  Furthermore, initial Rule 30(b)(6) deposition notices were served in accordance with his

deadline to do so.  The parties have met and conferred extensively in these Southern District of

---

[20] This protective order was then Ordered in at least one other case that your undersigned is aware
of.  *Koon v. AstraZeneca Pharmaceuticals LP, et al.*, 2:16-cv-02605 (D.Kan.)

Illinois cases and have agreed to specific dates for these depositions to go forward as to Defendants AstraZeneca and Procter & Gamble. Of note, Pfizer has agreed to make an initial document production on various Rule 30(b)(6) topics on June 28, 2017 that would include production for the Southern District of Illinois case(s). Additionally, Plaintiffs have already responded to Discovery Demands in these Southern District of Illinois actions, including interrogatories and request for production of documents.

The parties have started negotiating a proposed case management order concerning privilege logs and a case management order to govern deposition protocols will be forth coming in the days ahead because the first depositions here begin on July 12, 2017.[21] Recently, Judge Herndon reached out to the parties about their respective positions on the creation of a master docket so as to assist the Court and Clerk's office with the management of the filed actions and any newly filed cases that are likely forthcoming, as well as the appointment of an interim liaison counsel for Plaintiffs and Defendant to assist in these technicalities.

When Judge Herndon held his initial status conference and then issued his Scheduling and Discovery Order, he simply sought to advance the cases before him and he used his experience to do so.[22] His actions have moved these actions forward quickly, where all other filed actions have progressed slower. For this reason alone, he should be assigned this MDL.

### c. The Southern District of Illinois Has MDL Experience

While there are numerous potential jurisdictions with significant MDL and complex litigation experience that easily come to mind, such as the Eastern District of Louisiana and Judge

---

[21] While the parties have not started negotiating Plaintiff Fact Sheets ("PFSs"), it was Plaintiffs' understanding that because the Defendants were interested in moving these cases forward, it was their desire to propound traditional interrogatories and document demands in lieu of a PFS.

[22] Since then, he has held a second conference on June 15, 2017, and a third one is schedule for July 17, 2017 – essentially he anticipates a conference every four to six weeks.

Fallon, the Eastern District of New York and Judge Weinstein, and the Southern District of New York generally, the Southern District of Illinois may fall into this category because it has developed a solid record for overseeing some of the larger mass torts in the past 15 years, namely the Yasmin/Yaz litigation (MDL-2100) and the Pradaxa litigation (MDL-2385), both of which were assigned to Judge Herndon.

The Yasmin/Yaz litigation is over 99% concluded, *see Case Management Order 83*, 3:09-md-02100 (S.D.Ill.), and the Pradaxa MDL was closed over one year ago.   In all, close to 25,000 claims were effectively processed through complete resolution in these two litigations – in large part due to the ability of the Court, and Judge Herndon, to efficiently manage large these complex litigations.

Thus, the Southern District of Illinois, and Judge Herndon, certainly have ample MDL experience and can steer this MDL on a prudent course, as evidenced by the simple facts that: (1) a Scheduling and Discovery Order was entered only one day after he held his initial status conference (when before the parties could not agree on one); (2) a Protective Order and ESI Order were entered within two weeks of the initial conference; (3) initial depositions, which previously were opposed, are now scheduled with AstraZeneca (July 12th and July 21st) and Procter & Gamble (August 1, 2017 ) with Pfizer agreeing to document productions as its first responsive effort; (4) subsequent follow-up case management conferences have been held and set; and (5) he has employed a management persona when many other jurists have not taken one in these complex cases.

### d.     The Respective Caseload and History of Speedy and Effective Resolution Favors The Southern District of Illinois

According to judicial statists, each Southern District of Illinois judge had approximately 350 civil filings for the 12-month period ending on December 31, 2016.  Additionally, the only

two MDLs assigned to the Southern District of Illinois have essentially resolved and their resolution was accomplished in a speedy and effective manner due in large part due to the ability of this venue to efficiently manage large complex litigations.    Accordingly, judicial statistics as well as the speedy yet efficient resolution of the two prior MDLs assigned to the Southern District of Illinois support that the Southern District of Illinois is a suitable alternative venue.

> **e.     The Southern District of Illinois is Geographically Central and a Convenient Venue for the Parties, Their Witnesses and Their Counsel**

The Southern District of Illinois is a readily accessible and geographically central locale for this MDL and will provide convenient travel for attorneys and parties from across the country. The courthouse itself is in close proximity to Lambert–St. Louis International Airport and is, thus, a very convenient location for witnesses and parties to convene. Furthermore, there are a multitude of local hotels centrally located in downtown St. Louis, which is only minutes from the District Courthouse for the Southern District of Illinois. Therefore, in the interest of time, convenience, and economy, Plaintiffs submit that the Southern District of Illinois is undeniably the most appropriate forum in which these actions should be coordinated and centralized.

> **2.     As an Alternative, Plaintiffs Support the District of New Jersey as Advocated for in the SW Motion**

> **a.     The District of New Jersey is a Convenient Venue for the Parties, Their Witnesses and Their Counsel**

As noted in the SW Brief, this Panel has recognized the geographic convenience of the District of New Jersey as a venue for an MDL. The Newark Division is accessible by three major airports, and sits on train lines allowing for easy travel from Boston, Philadelphia, Delaware and Washington, D.C. There are abundant hotel accommodations both in Newark and the surrounding areas, as well as in New York City, which is a 20-minute train ride away. The convenience of the District of New Jersey makes it a good choice as a venue for this MDL.

      **b.**      **Judge Cecchi's Unique Background and Experience Make her a Good Choice to Manage this MDL**

Judge Cecchi is a jurist with ten years of experience on the federal bench. Additionally, she has managed an MDL with multiple defendants in the past,[23] which makes her uniquely qualified to oversee this litigation. Judge Cecchi, it appears, also has familiarity with issues that often arise in cases involving pharmaceutical products through her experience as one of a small group of judges who are designated to hear patent cases. For these reasons, Judge Cecchi also is a very capable jurist for this MDL.

      **c.**      **Judge Cecchi Has Moved Her PPI Actions**

Judge Cecchi has 62 cases currently pending before and she has held multiple status conferences with the parties. On May 17, 2017, she entered an ESI Order followed by both a Protective Order and Scheduling Order which she entered on May 25, 2017, with Defendants' first production of documents to take place in mid to late June. Judge Cecchi has familiarity with the facts underlying these actions and she has the ability to move these cases forward.

      **d.**      **The Current Caseload Favors The District of New Jersey, Newark Division**

The District of New Jersey currently has seven MDLs pending but a majority of these MDLs are not located in the Newark Division. Rather, only two MDLs are located in Newark and one of them is in settlement and requires only minimal resources. Therefore, the Newark Division has time and resources to devote to this MDL, which is a factor that supports the District of New Jersey, Newark Division, as an acceptable venue for this MDL.

**D.**      **THE OTHER VENUES ARE NOT MORE APPOPRIATE THAN THE SOUTHERN DISTRICT OF ILLINOIS OR THE DISTRICT OF NEW JERSEY**

---

[23] *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663, No. 2:04-cv-5184 (D. N.J. 2004).

As discussed above, there are at least 30 District Courts in which PPI actions have been filed to date, and there will likely be more as we approach the hearing date.  However, none of the jurists in these jurisdictions have been as attentive as Judges Herndon and Cecchi in moving their actions forward.  Judge Prater, the judge overseeing the Eastern District of Pennsylvania actions, has also been somewhat active, but the actions before her are nowhere near as advanced as those before Judges Herndon or Cecchi.  For example, Judge Prater has only entered one Order (a Protective Order), has not entered a scheduling order, has only held two conferences, but has not scheduled any future conferences, nor have any documents been produced or are they scheduled to be produced. Moreover, this venue was, respectfully, a manufactured venue as the cases filed there do not have a relationship to Philadelphia, Pennsylvania.  In fact, of the 37 cases filed in the Eastern District of Pennsylvania, none involve Pennsylvania residents. While it does not appear that any Plaintiff's counsel is advocating for the Eastern District Pennsylvania, in the event any of the Defendants advocate for this jurisdiction, your undersigned thought it prudent to identify the fundamental flaw with the exaggerated case filings in Philadelphia, especially given that proceedings in this venue have slowed down.  Indeed, if such tactics were permitted, which they are not, lawyers could file scores of cases in jurisdictions of their choosing simply to bolster numbers.

## IV.    CONCLUSION

Accordingly, Plaintiffs herein respectfully request that the Panel: (1) grant the SW Motion for consolidated and coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407; (2) transfer the actions to the Southern District of Illinois or, alternatively, to the District of New Jersey; and (3) grant such other and further relief as it may deem just and appropriate under the circumstances.

Dated: New York, New York
   June 27, 2017

          **DOUGLAS & LONDON, P.C.**


        By: _/s/ Michael A. London_
          Michael A. London, Esq. (ML-7510)
          Attorneys for Plaintiffs
          59 Maiden Lane, 6th Floor
          New York, New York 10038
          Ph:  (212) 566-7500
          Fax: (212) 566-75011